12cv370 Mem of Dec Op

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

2012 APR -9  P 1: 01

U.S. DISTRICT COURT
NEW HAVEN, CT

ERIN MITCHELL, DANIELLE
DIGIROLAMO, JOSH SMITH,
DONALD MONTANO, ALEXANDER
SUAREZ, TY HAILEY, RAY NEAL,
and JOSHUA HELTKE,

              Plaintiffs,

v.

                              No. 3:12cv370 (MRK)

CITY OF NEW HAVEN, JOHN
DESTEFANO, DEAN ESSERMAN,
and COMMITTEE OF THE
PROPRIETORS OF COMMON &
UNDIVIDED LANDS IN NEW HAVEN,

              Defendants.

## MEMORANDUM OF DECISION

Protesters have been living on the New Haven Green since October 2011 as part of a demonstration known as Occupy New Haven. Facing imminent eviction, eight Occupy members seek an injunction barring their removal from the Green, primarily on First Amendment grounds.[1] Due perhaps to their justifiable uncertainty as to who owns, manages, and regulates the Green—an issue to which the Court will soon return—Plaintiffs have named four Defendants: the City of New Haven; its Mayor, John DeStefano; its Chief of Police, Dean Esserman; and the Committee of Common and Undivided Lands in New Haven, a group that traces its purported ownership of the Green to New Haven's seventeenth-century founding.

---

[1] Plaintiffs also bring claims under Article 1, §§ 4, 5, and 14 of the Connecticut Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. These claims are discussed briefly in Part IV of this decision.

1

On March 14, 2012, Judge Janet C. Hall entered a Temporary Restraining Order [doc. # 11] maintaining the status quo at the Green for two weeks in order to give the parties time to brief, and this Court time to consider, the questions raised by Plaintiffs' Motion for Temporary Injunction [doc. # 2]. On March 28, 2012, this Court extended Judge Hall's Order until April 9, 2012 at 5 p.m. *See* Order [doc. # 35]. Having now carefully considered the Parties' briefs, as well as the evidence presented and the arguments vigorously made at last week's hearing, the Court finds that: (1) Plaintiffs' demonstration is protected speech under the First Amendment; (2) the New Haven Green is a traditional public forum; (3) the City's longstanding practice has established City Park Ordinances, along with Regulations written by the Proprietors, as rules governing the Green's use; and (4) the City has interpreted and enforced these rules in a way that makes them constitutionally valid, content-neutral, time, place, and manner restrictions on speech. Since Plaintiffs' demonstration is not currently in compliance with these rules, the City may order them to remove their encampment from the Green.

## I.

### A.

The New Haven Green comprises sixteen acres filled with century-old trees in the middle of downtown New Haven. Originally referred to as the Market Place, the Green was the central block in the nine-square grid along whose lines the City was designed in 1638. *See* Fig. 1. This Court finds its home on the Green's perimeter, alongside New Haven's City Hall, the New Haven County Courthouse, Cass Gilbert's Free Public Library building, and Yale University's Old Campus. This area is a designated National Historic Landmark.

The Green is bisected by Temple Street into what are referred to as its Upper (northwestern) and Lower (southeastern) halves. There are two permanent structures on the

Lower Green: a flagpole memorializing the First World War and the Bennett Fountain; during certain parts of the year the Lower Green is also the site of the City's Christmas Tree and, in the summer, a large stage on which concerts are held. Aside from three churches lining Temple Street, the Upper Green consists entirely of trees and open park space. This is said to be the more environmentally fragile portion of the Green.



Figure 1. The Nine-Square Plan of 1638. Available at http://www.cityofnewhaven.com/ CityPlan/pdfs/PlanningPrograms/ComprehensivePlan/SectionIIntroduction.pdf.

Since October 15, 2011, Occupy New Haven protesters—adopting many of the techniques and aims of the Occupy Wall Street demonstration which began in September 2011 in New York's Zuccotti Park—have resided in tents set up on a portion of the Upper Green opposite the gate to Yale's Old Campus. According to their Second Amended Complaint, the eight Plaintiffs in this case "either currently reside for extended periods on, or visit, the New Haven Green." Second Am. Compl. [doc. # 29] ¶ 3. "They have met there with other like-minded citizens to erect a tent city designed . . . to be a tangible representation and expression of their frustration over the gap between the rhetoric of the American Dream and [the] reality of their

lives." *Id.* ¶ 1. Plaintiffs claim that their encampment on the Green is "a tangible reminder of the reality of homelessness and the hardship of poverty, facts often swept out of sight . . . in urban areas. . . . Its round-the-clock status serves as a direct reminder that the nation's economic crisis is a present and daily reality for millions of Americans." *Id.* ¶ 12.

The Committee of the Proprietors of Common and Undivided Lands in New Haven stems from the New Haven Colony's founding, when settlers who had contributed to the expense of the enterprise—those known as the "proprietors"—took possession of certain plots of land and jointly maintained the rest as "common and undivided lands." *See* Pls.' Mot. for Extension of Injunctive Relief [doc. # 24-2] Ex. B at 8-9. As the proprietors' descendants multiplied, management of these lands became unwieldy; in response, a committee was formed, first of seven members and then, in 1805, of five. The proprietors' interests in the common and undivided lands were transferred to the Committee, and its power to "alienate [its] remaining proprietary property" and to fill "vacancies in [the Committee's] number by death or resignation" was confirmed by the Connecticut General Assembly in 1810. *Id.* at 11. The Committee— referred to below as "the Proprietors"—now claims the Green as the only property remaining under its ownership. Drew Days, the Committee's current chair, testified at the hearing that the Proprietors view the Green as private property for public use. The Proprietors view themselves as stewards of the Green and as advisors to the City, especially on questions about how the Green and its trees can best be protected. The City maintains the Green and issues permits for its use.

B.

The Proprietors adopted "Regulations Governing the Use of the Green" in 1973 and amended them in 1984. *See* Hr'g Ex. K (hereinafter "Proprietors' Regulations"). These require

"any individual, group or organization" to obtain a permit from the New Haven Director of Parks, Recreation and Trees at least three weeks before holding "a meeting, rally, exhibit, demonstration, or any other event on the New Haven Green." *Id.* ¶ (a). The Proprietors' Regulations further require that the Parks Director, "with the concurrence of the Chief of Police and Director of the Department of Health, in appropriate cases, *shall issue permits*" when he finds the following:

> (1) That the proposed activity or use of the Green will not unreasonably interfere with or detract from the general enjoyment of the Green;
> (2) That the proposed activity or use will not unreasonably interfere with or detract from the promotion of public health, safety and recreation;
> (3) That the proposed activity is not reasonably anticipated to incite violence, crime or disorderly conduct;
> (4) That the proposed activity or use will not entail unusual, extraordinary or burdensome expense to the City;
> (5) That the facilities desired have not been reserved for other use on the day and at the hour requested in the application.

*Id.* ¶ (g) (emphasis added). Three other provisions in the Proprietors' Regulations are relevant to the present case. Paragraph (j) decrees that "[n]o signs will be placed on the New Haven Green without permission of the Department of Parks, Recreation and Trees." *Id.* ¶ (j). Paragraph (l) provides those denied a permit by the Parks Director with a right to appeal to the Proprietors, who "shall consider the application" according to the five standards quoted above "and either sustain or overrule the Director." *Id.* ¶ (l). Neither Mr. Days nor New Haven's Park Director, Robert Levine, can recall an instance in which such an appeal has been taken. Finally, paragraph (k) of the Proprietors' Regulations requires permittees to comply "with such rules and regulations of the City of New Haven . . . as may from time to time be in force and effect for the use of public parks generally." *Id.* ¶ (k).

The City's general rules for the use of public parks are found in Title III, Chapter 19 of New Haven's Code of General Ordinances. *See* Hr'g Ex. L (hereinafter "Ordinances"). The

Ordinances do not explicitly mention the New Haven Green, but the City's Parks Director testified at the hearing that the City considers the Green to be a "public park" under the terms of Ordinances § 19-3.

Several provisions of the City Ordinances are relevant here, beginning with the City's permit requirement. Permits are required for any "organization, group, or individual requesting permission to hold or present an organized event, assembly, public speech, musical program, festival, or similar activity in any park area." *Id.* § 19-5(b)(1). The Parks Director, "[i]n order to ensure the public's fair and full use of the city parks, to promote general public enjoyment of the parks through coordinated scheduling of activities, and to promote health, safety, welfare and recreation . . . may issue permits . . . unless the director finds:

> (1) The facilities desired have been reserved for other use at the day and hour requested in the application. In such case, an alternative site will be offered if available;
> (2) The activity is to be held for the sole purpose of advertising products or goods, and/or is designed to be held purely for commercial profit; or
> (3) The proposed attendance, duration and usage of sound amplification equipment, either alone or in combination, would constitute a disturbance of the surrounding neighborhood. If the applicant's request is denied, the director shall use his/her best efforts to offer an alternative location acceptable to the applicant.

*Id.* § 19-8. The Ordinances prohibit all persons from constructing or erecting "any building or structure for temporary use . . . upon or across any park, except on special written permit from the director," *id.* § 19-5(b)(5)(iii); they disallow damage to plants, digging and disturbing the grass, and injuring the "natural elements of any park area," *id.* § 19-5(b)(5)(iv); they require a permit in order to use a park between 10:00 p.m. (if lighted—otherwise after sunset) and 6:00 a.m., *id.* § 19-5(b)(16); and they only allow fires to be lit in designated grilling areas, none of which are on the Green, *id.* § 19-5(b)(11).

C.

There is no dispute that neither Plaintiffs nor any of the other people currently encamped on the Green ever applied for or obtained a permit from the City. Despite this, the City and Proprietors implicitly consented to Occupy's presence for several months, providing the protesters with trash and toilet facilities at the City's expense. Meetings were held in February between certain Occupy members, City officials, and, on one occasion, Mr. Days, after which the City released a "Proposal for Occupy New Haven" requesting that Occupy remove "[s]tructures on the Green . . . by mid-March." In return, the City and Proprietors said they would "allow [Occupy] with structures [sic] to reassemble on the Green for durationally limited periods (generally not to exceed one week) at times in the future mutually agreeable to all parties." Hr'g Ex. I. Having implicitly rejected these terms by remaining on the Green, Occupy demonstrators were given notice on March 11, 2012 that they were to "take down any and all tents and structures and vacate the New Haven Green" no later than March 14, 2012. Hr'g Ex. J. The Notice concluded: "Both the City of New Haven and the Proprietors of the Green appreciate the dedication you have brought to the cause of economic justice, and we wish you well as you move forward elsewhere." *Id*.

This lawsuit followed.

## II.

Generally, a party seeking a preliminary injunction must show that it will suffer irreparable harm if the injunction is not issued, and, in addition, "either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of N.Y.*, 626 F.3d 47, 53 (2d Cir. 2010).

A higher standard applies, however, when the preliminary injunction that is sought is one that would "affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Id.* In that case, the party seeking the injunction must satisfy the likelihood of success test; "the moving party cannot resort to the 'fair ground for litigation' standard." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).[2]

Given that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003),[3] Plaintiffs' claim of irreparably injury stands or falls with the merits of their First Amendment claim. *See Beal v. Stern*, 184 F.3d 117, 123-24 (1999) ("[T]he presence of irreparable injury turns on whether the plaintiff has shown a clear likelihood of success on the merits."); *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 853 (2d Cir. 1996) ("[T]he irreparable harm inquiry depends on the merits of the claims."); *Metro. Council, Inc. v. Safir*, 99 F. Supp. 2d 438, 443 (S.D.N.Y. 2000) ("In a First Amendment case such as this one, the issue of

---

[2] A still higher standard applies when the preliminary injunction that is sought would either alter the status quo or would "provide the movant with substantially all the relief sought." *Jolly*, 76 F.3d at 473. Not only do Plaintiffs want the status quo maintained, they argue that their presence on the Green should be allowed to continue indefinitely. Because the preliminary injunction under consideration is not of indefinite duration, its issuance would not provide Plaintiffs with all the relief they seek. Thus, the Second Circuit's highest preliminary injunction standard is not applicable here.

[3] Defendants misunderstand this Court's opinion in *Doninger v. Niehoff*, 514 F. Supp. 2d 199 (D. Conn. 2007), insofar as they claim that "the Second Circuit does not presume irreparable harm in cases involving the First Amendment." Defs.' Supp. Mem. of Law [doc. # 28] at 4. The Court said in *Doninger* that the Second Circuit does not *always* give a free pass on the irreparable harm question—not that it does not do so at all. *Doninger*, 514 F. Supp. 2d at 210. *Bronx Household* makes clear when irreparable harm can be presumed: namely, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech." 331 F. 3d at 349. Telling a group of protesters that they must stop their protest is quite clearly a direct limitation on speech. The question that follows is whether this limitation may still be permissible under the First Amendment. The Court considers that question in Section III.C, below.

8

irreparable harm merges with the question of success on the merits."). Since the two prongs of the preliminary injunction test merge here, the Court can focus directly on whether Plaintiffs have shown a likelihood of success on the merits. For the reasons below, the Court finds that they have not.

## III.

As one of this country's oldest public spaces—in continuous public use since 1638—the New Haven Green is uniquely well-described by a passage written by Justice Owen Roberts over seventy years ago and often repeated since:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515-16 (1939) (opinion of Roberts, J.). Justice Roberts's words elegantly sum up the issues confronting the Court today: the status of a park, of possibly uncertain title, long held in trust for the public; the park's use since "time out of mind" as a site of public assembly and discussion; and, finally, the need to regulate such assembly and discussion for the peace and good order of society at large.

The way to navigate these issues in conformity with the First Amendment is well-established. The Court must first determine whether the expression under threat is protected speech. Next, the Court must identity the nature of the forum in which the expression is occurring. Finally, the Court must assess whether the justifications for and manner of restricting

the expression satisfy the requisite standard, given the nature of the forum. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

A.

The Court will not linger long on the first question. Plaintiffs are engaged in protected speech. The demonstrators' signs, flags, chanting, and art all constitute political speech in its purest form. In addition, the tents which Occupy members have erected and inhabited, and even the act of sleeping in those tents, are themselves forms of expression—as the Supreme Court, in a related context, has assumed without deciding, and as courts throughout the country, faced with Occupy protests in their own cities, have repeatedly found in recent months. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Watters v. Otter*, No. 1:12-CV-76-BLW, 2012 WL 640941, at *4 (D. Idaho Feb. 26, 2012); *Occupy Columbia v. Haley*, No. 3:11-cv-03253-CMC, 2011 WL 6318587, at *6 (D.S.C. Dec. 16, 2011); *Occupy Minneapolis v. Cnty. of Hennepin*, Civ. No. 11-3412 (RHK/TNL), 2011 WL 5878359, at *4 (D. Minn. Nov. 23, 2011); *Occupy Fort Myers v. City of Fort Myers*, No. 2:11-cv-00608-FtM-29DNF, 2011 WL 5554034, at *5 (M.D. Fla. Nov. 15, 2011); *see also United States v. Abney*, 534 F.2d 984, 985 (D.C. Cir. 1976) (per curiam) (finding sleeping, in certain circumstances, to be "sufficiently expressive in nature to implicate First Amendment scrutiny").

Though Defendants acknowledge that Plaintiffs' signs and chants constitute speech, they dispute Plaintiffs' claim that camping and sleeping on the Green are similarly expressive. Defendants' argument here is misguided. Plaintiffs are not claiming, as the City's counsel did at oral argument, that damaging the grass on the Green is an expressive activity. This would be akin to claiming that organizers of parades think of traffic disruption as an expressive act. Damage to the grass is a cost or byproduct of Plaintiffs' expressive activity here, just as road closures are a

cost of allowing parades. First Amendment law has ample ways to take account of such costs, *see infra*, without requiring courts to deny that the activities giving rise to the costs fall outside the zone of protected speech.

Similarly unavailing is Defendants' claim that Plaintiffs' "occupation" of the Green through round-the-clock camping fails the test established by the Supreme Court in *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (requiring an "intent to convey a particularized message" and a likelihood "in the surrounding circumstances . . . that the message would be understood by those who viewed it"). In addition to misquoting the *Spence* test, *See* Defs.' Supp. Mem. [doc. # 28] at 22, the City neglects *Spence*'s emphasis on context. *See id.* at 410 ("[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol."). One would have to have lived in a bubble for the past year to accept Defendants' claim that Occupy's tents "could simply mean that the plaintiffs enjoy camping." Defs.' Supp. Mem. of Law [doc. # 28] at 23. The City's eviction notice did not seem confused on this point when it congratulated the protesters' commitment to "economic justice" rather than their love of the great outdoors.

The Occupy movement, in New Haven as elsewhere, aims to exemplify its message: to express the desire that the economically disenfranchised become more central to American public life by literally placing the economically disenfranchised in the center of America's public spaces. Defendants need not deny the obvious political expressivity of this act in order to argue that reasonable limits on acts like this may still be necessary and appropriate.

B.

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property

11

at issue." *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 44 (1983). According to this longstanding "forum based" approach for assessing restrictions on the use of government property, courts must determine whether a given space is a traditional public forum, a public forum created by government designation, or a nonpublic forum. *See Cornelius*, 473 U.S. at 802. "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* at 802 (quotation marks omitted). Streets and parks have long been identified as the paradigmatic examples. *See, e.g., Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992); *Cornelius*, 473 U.S. at 802; *Perry*, 460 U.S. at 45; *Hague*, 307 U.S. at 515. Ordinarily then, a park, such as the Green, that has long been dedicated to public assembly and expression would easily qualify as a traditional public forum.

Here, however, the status of the Green is potentially complicated by the unique relationship between the Proprietors and the City. The United States and Connecticut Supreme Courts have both made clear that neither the First Amendment of the Federal Constitution nor the corresponding provisions of the Connecticut Constitution limit restrictions of speech on private property—even property, like shopping centers, which the public is generally invited to use. *See Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972); *Cologne v. Westfarms Assoc.*, 192 Conn. 48 (1984). On the other hand, "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299 (1966) (finding that the "public character" of a park held as a charitable trust "require[d] that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law").

Courts have largely been able to sidestep the thorny issues arising from public-private partnerships like these. The site of the original Occupy Wall Street protest, Zuccotti Park, is itself a privately owned and maintained park that is kept open for public use. But the New York state court judge who was asked last Fall to stop the eviction of the demonstration there was able to assume without deciding that the First Amendment applied. *See Waller v. City of N.Y.*, 933 N.Y.S.2d 541, 544 (N.Y. Sup. Ct. 2011). The Second Circuit faced an analogous situation in *Hotel Emps. & Restaurant Emps. Union, Local 100 v. N.Y.C. Dep't of Parks & Recreation*, 311 F.3d 534 (2d Cir. 2002), where regulations governing the use of the plaza at Lincoln Center were made by a private entity, Lincoln Center, Inc., pursuant to a licensing agreement with New York City. The Union argued that Lincoln Center, Inc. acted as New York City's agent and, further, that the city could not "insulate itself from liability by delegating this public function" to a private entity. *Id.* at 544. Because the Second Circuit did not find that Lincoln Center, Inc.'s regulations would have violated the Constitution, it did not have to reach the question of whether it was a state actor, subject to the First Amendment's limitations.

This Court too is able to settle the present dispute without resolving these larger issues. The parties have assumed, at least for the sake of this motion, that the New Haven Green is a public forum. The Court will thus treat it as such as it turns to the question of whether New Haven's regulations governing the public's use of the Green are consistent with the First Amendment.

C.

In a traditional public forum, the very purpose of which is "the free exchange of ideas, speakers can be excluded . . . only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800.

13

As the Supreme Court held in *Clark v. Community for Creative Non-Violence*, a case also concerning a protest involving tents and sleeping in a park:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. . . . [R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

468 U.S. at 293.

Before it applies *Clark*'s three-part test to the regulations at issue in this case, however, the Court must first answer a more fundamental question: What regulations, if any, govern the New Haven Green?

1.

Plaintiffs argue that since the City's Ordinances do not refer to the Green, and since the Proprietors—whose Regulations, of course, *do* refer to the Green—lack the legal authority to promulgate generally applicable local laws, no valid rules currently govern the Green's use.

At the hearing on the present motion, New Haven's Parks Director testified that his authority over the Green comes from the Proprietors' Regulations. More specifically, Paragraph (a) of the Proprietors' Regulations, which requires users to obtain permits from the Parks Department, paragraph (g), which provides criteria for the issuance of permits, paragraph (k), which makes New Haven's regular park ordinances applicable to the Green, and paragraph (l), which requires the Parks Director to respond to permit applications in writing within five days, together delegate to the Parks Director the authority and responsibility of regulating the Green's use.

These are, admittedly, murky matters. It is one thing, legally, for the Proprietors to establish rules governing the use of land they claim to own. It is another and more troubling

14

thing for a private group to require a public official to enforce those regulations and, especially, to do so in a manner and on a schedule decreed by the Proprietors. Duplicating the City's established appellate review process for denied permits with a right to appeal directly to the Proprietors—who claim the power to overrule City decisions—is additionally worrisome. *Compare* Ordinances § 19-10, *with* Proprietors' Regulations ¶ (l). Confusion surrounding these issues is not lessened by the unexpected fact that Mr. Days, Chair of the Proprietors Committee, testified that the Proprietors' Regulations are *not* binding, whereas Mr. Levine, the City's Director of Parks, testified that he *does* regard them as such.

The overarching problem here is that the City has never formally made the Proprietors' Regulations its own. In fact, the City's ordinances never explicitly mention that the Parks Department has any authority over the Green at all.

And yet, when courts evaluate a First Amendment challenge to a regulatory scheme, they "may examine not only the text of the ordinance, but also any binding judicial or administrative construction of it. And [they] are permitted—indeed, required—to consider the well-established practice of the authority enforcing the ordinance." *MacDonald v. Safir*, 206 F.3d 183, 191 (2d Cir. 2000) (citing *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

The City's Ordinances give the Director of Parks control and management of "all public parks, squares and open places included in the city's park system." Ordinances § 19-3. The uncontroverted evidence presented to the Court thus far indicates that the City's well-established practice is to count the New Haven Green among its "public parks" and, additionally, to manage the Green according to the terms of both the City's Ordinances and the Proprietors' Regulations.

Thus, whereas Defendants—and, it must be said, New Haven's own Parks Director— derive the Parks Department's authority over the Green from paragraph (k) of the Proprietors'

Regulations, the Court moves in the reverse direction, beginning with the City's well-established interpretation of its own Ordinances and, on that basis, considering the Green as one of the City's parks and the Proprietors' Regulations as among the City's rules.

By relying on the City's well-established—indeed, seemingly uninterrupted—practice, the Court need not determine the legal status of the rules as promulgated by the Proprietors. It is the City's well-established reliance on the Prioprietors' Regulations and not the Proprietors' issuance of them that gives the Proprietors' Regulations their legal force and makes them binding on those wishing to use the New Haven Green. Similarly, it is the City's longstanding application of its Ordinances to the Green, not any explicit statement in the Ordinances themselves, that causes the Court to view the Ordinances as additional rules governing the Green's use. If longstanding regulations can survive constitutional challenge even when they are unwritten and undocumented, *see Turley v. Police Dep't of N.Y.C.*, 167 F.3d 757, 762 (2d Cir. 1999), the City's longstanding practice of employing written rules—which provide the public significantly better notice of the practice—should be still more constitutionally secure.

As it applies the *Clark* test in the three sections that follow, the Court will therefore look to the City's Ordinances, the Proprietors' Regulations, and the City's well-established tradition of applying both in regulating the public's use of the Green.

2.

"[R]easonable time, place, or manner restrictions. . . are valid provided that they are justified without reference to the content of the regulated speech." *Clark*, 468 U.S. at 293. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, the relevant provisions of the City's Ordinances and the

16

Proprietors' Regulations are ones that prohibit structures on the Green, require everyone who organizes an event to obtain a permit, and limit the hours in which parks can be used.

There is no question that the government can choose to prohibit people from erecting structures on public property. *See, e.g.*, *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 347 (7th Cir. 1990) ("Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will."). In *Clark*, the Supreme Court held that a regulation prohibiting camping in a park is allowable as a means of maintaining parks "in an attractive and intact condition" and to allow broader accessibility to other members of the public. 468 U.S. at 296, 298. The prohibition on structures in the Green is thus permissibly content-neutral.

The City's permit requirement differentiates based on content only insofar as it distinguishes purely commercial activity—a provision not at issue in this case. *See* Ordinances § 19-8(2). The restrictions on nighttime use of the park do not distinguish among types of use at all. These regulations too are therefore content-neutral, at least on their face.

Even when they are facially content-neutral, however, regulations that limit expression can still run afoul of the Constitution if those regulations are overly broad or not uniformly applied. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002). As the Supreme Court held in *Cox v. Louisiana*, "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not . . . either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute." 379 U.S 536, 557-58 (1965). The Second Circuit has echoed: "Just as it is obvious that application of a facially neutral

law may violate the equal protection clause, so too may the application of a facially neutral law so as to discriminate against certain speakers or ideas violate the First Amendment." *Field Day LLC v. Cnty. of Suffolk*, 463 F.3d 167, 193 (2d Cir. 2006) (citation omitted).[4]

Navigating between what the Second Circuit has called "the Scylla of regulations that are so tightly worded that the flexibility needed for administration is lacking, and the Charybdis of language so loose that, as a practical matter, courts become the licensing bureau," *MacDonald*, 206 F.3d at 191, New Haven has veered dangerously close to Charybdis's side of the water. The language of the City's Ordinances and the Proprietors' Regulations, standing alone, would not provide anything close to enough guidance to survive a First Amendment challenge. Read literally, the Ordinance governing permit issuance allows the Park Director to reject any permit he wishes. While it places three restrictions on what permits the Director may grant, it provides no restrictions at all on what permits he may deny. *See* Ordinances § 19-8.

The exceptions permitted by the Regulations and Ordinances are similarly problematic. The prohibitions most germane to Occupy's protest—the restrictions on structures, signs, and the use of parks between 10 p.m. and 6 a.m.—are all ones that can be waived by the Director of Parks. *See* Ordinances §§ 19-5(b)(5)(iii) (requiring a "special written permit from the director" in order to erect a "structure for temporary use"); 19-5(b)(16) ("By permit, exceptions to the above

---

[4] Also relevant here is *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587 (2d Cir. 1994), a case Defendants quote in their brief. Defendants are right to argue that, according to *LaTrieste*, "principles of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." *Id.* at 590. In other words, the fact that the City allowed Plaintiffs to remain on the Green for five months does not mean that it cannot start enforcing its regulations now. However, the Court finds more relevant the very next sentence in *LaTrieste*, where the Second Circuit observed that the plaintiff's claim was "not only that the village previously failed to enforce the restrictions, but also that it is now enforcing them selectively, discriminatorily, and for an unconstitutional motive of suppressing free expression." *Id.* The danger of selective enforcement—not estoppel—is what concerns the Court in the present matter.

hours may be allowed in accordance with procedures established by the parks department."); Proprietors' Regulations ¶ (j) ("No signs . . . without permission of the Department of Parks."). Neither the Ordinances nor the Regulations provide specific standards that constrain the Parks Director's decisions about what exceptions he should make or not make. Yet as the Supreme Court has made clear, "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional." *Thomas*, 534 U.S. at 325.

Despite these serious shortcomings in the text of the rules governing the Green, Defendants are saved once again by the fact that courts do not look only at the language of rules being challenged, but must also "examine the practice of the licensing body." *MacDonald*, 206 F.3d at 193. Unlike the broad discretion allowed by the text of the City's Ordinances and the Proprietors' Regulations, Defendants' actual practice—at least according to the evidence currently before the Court—is remarkably constrained. At last week's hearing, the City's Parks Director testified that he only denies permits when some other group has requested the same space. Thus, it seems that the Ordinances' permissive "may" in the section on permit issuance is, in practice, treated as a "must." *See* Ordinances § 19-8. In other words, the Parks Director, working when appropriate with other named city officials, *must* issue permits for the use of city parks unless the facilities desired have been previously reserved, the intended use is commercial, or the proposed attendance, duration, and/or noise would cause a disturbance of the surrounding neighborhood. *Cf. id.* The same section makes clear that the City's permit policy is intended to achieve the City's goals of promoting "fair and full use" of the parks, the coordination of activities, and the health, safety, welfare, and recreation of the general public. *See id.*

So long as these are the only considerations taken into account when the City issues its required permits, the Court sees no constitutional danger in the City's practice. The worries that

arise from the text of the Regulations and Ordinances, taken alone, dissipate when it is read in light of the City's well-established practice. While the permit process required to build structures on the Green, place signs there, or use the Green at night may, on its face, seem overly discretionary, it is sharply constrained by the consistent Parks Department practice of denying permits only when necessary to conserve the parks for safe, shared public use.

Of course, the Court can only say this based on the evidence before it. Should Plaintiffs discover that this evidence is incorrect or incomplete, the Court's analysis may well change.[5] For now, however, Plaintiffs have not shown a likelihood of success on the merits of their claim that the City lacks content-neutral rules governing the use of the Green.

3.

In determining whether regulations are narrowly tailored—*Clark*'s second requirement— courts are not to think up other, imagined regulations which might accomplish a given end in a less intrusive way. Instead, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quotation marks and alteration omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest," *id.* at 800, the narrow tailoring test is passed. Suffice it to say that this is not a particularly burdensome hurdle to clear.

The City's Park Ordinances list among their goals ensuring "fair and full use of the city parks, encouraging public enjoyment "through coordinated scheduling of activities," and promoting "health, safety, welfare and recreation." Ordinances § 19-8. The Proprietors' Regulations echo these goals. *See* Proprietors' Regulations ¶ (g). Requiring permits is clearly

---

[5] The Court notes that while it offered Plaintiffs the chance to request expedited discovery, they have not yet done so.

essential to the coordination of activities in the City's parks. Policies that allow the placement of structures and signs and overnight use of the Green only when those would not conflict with other uses or interfere with public health, safety, or the general enjoyment of the Green—the only factors relevant during the permit process—are also not substantially broader than necessary to achieve the City's interests.

4.

The third prong of the *Clark* test requires the Court to ask whether alternative channels of communication would be available to Plaintiffs should Defendants be allowed to enforce their regulations. The City argues that the Occupy protesters are able to get their message out through Facebook, Twitter, and the Occupy New Haven website. Without disputing this, the Court doubts that these channels alone would be sufficient under *Clark*. There is something unsatisfying about telling a movement that aims to make visible an often unseen, ignored population that it should content itself with forms of communication that are only seen when someone seeks them out.

Were the internet Plaintiffs' only recourse here, the Court might well find the City's restrictions overly burdensome. But the City's Ordinances and the Proprietors' Regulations leave plenty of alternative channels. Nothing in the rules governing the Green suggests that Plaintiffs, once they obtain a permit, will not be able to continue demonstrating on the Green, at least without their tents and during the day. (Counsel for the City confirmed at oral argument that protests would be allowed to continue, at least in some form, once permits were issued.) Should Plaintiffs feel that having tents or a round-the-clock presence is integral to their expression, they may apply for a permit that allows for this, at which point the Parks Director, pursuant to Ordinances § 19-8(3), shall "use his/her best efforts to offer an alternative location acceptable to

the applicant." The time, place, and manner regulations at issue here thus allow for either a different time and manner of protest on the Green, or else a protest that shares the time and manner of the current demonstration, but in a different place.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Given the many other locations and means in which Plaintiffs can continue their protest, the Court finds that the restrictions the City seeks to enforce are constitutionally acceptable.

## IV.

Although the parties' briefing and oral argument focused primarily on the First Amendment, Plaintiffs have also raised claims under the corresponding provisions of the Connecticut Constitution as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court will address each of these claims in turn.

"[T]he Connecticut constitution, under article first, §§ 4, 5, and 14, provides greater protection for expressive activity than that provided by the first amendment to the federal constitution." *Leydon v. Town of Greenwich*, 257 Conn. 318, 347 (2001). In place of the forum-based approach described above, Connecticut's courts employ what they call "the 'compatibility' test set forth in *Grayned v. Rockford*, 408 U.S. 104 (1972), under which 'the crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.'" *Id.* at 348 (quoting *Grayned*, 408 U.S. at 116). Under the compatibility test, the government "cannot restrict a person's access to public property unless that person intends to engage in expressive activity that is basically incompatible with the customary use of the property at the time in question." *Id.*

The Court is surprised that Plaintiffs did not make more of their claims under the state constitution, given the broader protections offered there. Having reviewed the applicable case law on its own, however, the Court finds that the rules governing use of the Green, at least as they have been interpreted in practice by the City, are consistent with the Connecticut Constitution. The compatibility test requires courts to look at the intended purpose of the space—a here, a park—and determine whether the restrictions on its use prohibit only such activity as would thwart that purpose. The Court has already noted that the City's Ordinances and the Proprietors' Regulations both state a desire to promote aims tied specifically to parks: shared use, public enjoyment, health, safety, and recreation. Thus, insofar as the Court found above that according to longstanding practice, the rules governing the Green are enforced only to regulate conduct that conflicts with those values, the rules pass Connecticut's compatibility test.

Plaintiffs' Due Process claim can be addressed still more quickly. The argument that the regulations governing the Green were improperly promulgated by a private organization—the Proprietors—was already answered. The Court has looked to the Proprietors' Regulations along with the City Ordinances not because the Committee of the Proprietors says the Court has to—in fact, Mr. Days testified that the Regulations merely provide guidance—but because it is the City's well-established practice to follow both the Regulations and its Ordinances in its management of the Green. As for the claim that Plaintiffs cannot be removed from the Green without process that comports with the Fourteenth Amendment, the Court notes that the Ordinances provide several procedures protecting those who apply for permits to use City parks, *see* Ordinances §§ 19-8, 19-10, and counsel for the City also represented that administrative decisions could be appealed to the Superior Court. Having failed to apply for a permit to use the

Green, Plaintiffs cannot now complain that they were deprived of the procedures designed to protect those who do so.

Plaintiffs' Due Process and state constitutional claims thus do not alter the Court's previous analysis under the First Amendment.

## V.

The City's rules governing the use of the New Haven Green—as established and clarified through longstanding practice—are constitutionally acceptable, content-neutral restrictions on the time, place, and manner in which members of the public can exercise their most important civic rights in New Haven's most important public space. Properly employed, rules like these do not stifle speech, but coordinate it to allow for expression that is as vibrant and varied as possible.

Because Plaintiffs have not shown that they are likely to succeed on the merits of their First Amendment claim, their Motion for a Temporary Injunction [doc. # 2], their Motion for Extension of Injunctive Relief [doc. # 24], and their recently filed Motion to Extend the Temporary Restraining Order [doc. # 40] are DENIED. Upon the expiration of the Restraining Order [doc. # 35] currently in effect, the City of New Haven may enforce its rules for the Green and require Plaintiffs, who are currently violating those rules, to remove their encampment within a reasonable period of time.

The Court expects that the City will work with Plaintiffs and their fellow protesters to facilitate an orderly removal of the structures they have erected on the Green. The Court asks that the City allow Plaintiffs until at least noon tomorrow to clear and clean the encampment area. Should the City need to dismantle any structures on the Green after that time, the Court's hope is that the City will do so during daylight hours, that it will make every reasonable effort to

avoid destroying personal property, and that, when possible, it will allow owners a chance to reclaim any property that is removed.

Should Plaintiffs wish to continue protesting on the Green, they need only apply to the City for a permit. The City has made clear that it will grant permit applications unless the requested use would endanger the Green or the public, or would conflict with other desired uses of the space. Even when it denies a permit application, the Parks Department is required by City Ordinance to work with applicants to find suitable alternatives. Given the relatively minimal, content-neutral restrictions governing the Green's use, the Court is confident that Plaintiffs will be able to continue assembling and speaking on New Haven's Green without either endangering or monopolizing it.

Plaintiffs have already expressed their desire to appeal an adverse decision from this Court to the Second Circuit, *see* Mot. to Extend Temporary Restraining Order [doc. # 40], and they have asked this Court to issue a stay that would maintain the status quo on the Green while their appeal is pending, *see* Fed. R. Civ. P. 62(c). Following the test laid down by the Second Circuit, the Court has balanced the irreparable injury Plaintiffs might suffer, the substantial injury facing Defendants, the extent to which Plaintiffs have demonstrated a "substantial possibility" of success on appeal, and any public interests that might be affected. *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1992). The Court does not rule out the possibility of Plaintiffs' success on appeal, and it notes that for the reasons given in Part II, Plaintiffs will have demonstrated irreparable injury if (and only if) their First Amendment claim succeeds on the merits. However, hanging in the other side of the balance is Defendants' genuine interest in protecting the Green and its trees and the public's interest in maintaining a permit process that facilitates the safe and shared use of public spaces. Since Plaintiffs are being required to alter

only the time, place, or manner of their protest—not, by any means, to stop protesting entirely—the Court finds that the balance of the equities does not favor a stay. Thus, unless the Second Circuit determines otherwise, the City will be allowed to begin enforcing its rules governing the use of the Green, in the manner discussed above, as of noon tomorrow.

IT IS SO ORDERED.

/s/ Mark R. Kravitz,U.S.D.J.
Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: April 9, 2012.**